## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 13-21653-CIV-WILLIAMS

MICHAEL I. GOLDBERG, not individually but as
Chapter 11 Trustee of the estate of the Debtor,
Rothstein Rosenfeldt Adler, P.A., *et al.*,

      Plaintiffs,

v.

NATIONAL    UNION    FIRE    INSURANCE
COMPANY OF PITTSBURGH, PA., *et al.*,

      Defendants.

_____/

### <u>ORDER</u>

**THIS MATTER** is before the Court on motions to dismiss Plaintiffs' first amended

complaint (DE 18, hereinafter the "FAC") filed by Defendants National Union Fire

Insurance Company of Pittsburgh, PA ("National Union") and Twin City Fire Insurance

Company ("Twin City"; with National Union, the "Insurers") (DE 25, 28).   Plaintiffs,

Michael Goldberg, as Chapter 11 Trustee of the estate of the Debtor, Rothstein

Rosenfeldt Adler, P.A., *et al.* ("RRA Trustee"), and Robert C. Furr, as Chapter 7 Trustee

of the estates of Banyon 1030-32, LLC, and Banyon Income Fund, LP, *et al.* ("Banyon

Trustee") (collectively, "Plaintiffs"), responded in opposition to the motions to dismiss,

(DE 35, 36), and the Insurers replied (DE 42, 43).   Following argument, the Court

permitted the parties to file a supplement to the motion and opposition (DE 70).   On

April 13, 2015, the parties filed their supplemental briefing (DE 74, 75, 78).

## I.   BACKGROUND

This case is yet another in the ongoing litigation saga concerning the misdeeds of the Rothstein Rosenfeldt Adler firm.  No party comes to the litigation as a stranger to the facts: each has litigated disputes spawned by Rothstein in federal district, federal bankruptcy, and state courts. The facts relevant to the instant dispute are recited below.

Gibraltar Private Bank & Trust Company ("Gibraltar") and certain of its officers and directors (the "D&O Defendants") have been sued in numerous lawsuits.  The suits pertinent to this action are (1)  *Edward J. Morse, et al. v. Scott W. Rothstein, et al.*, Case No. 10-24110 (the "Morse Action"); and (2) *Herbert Stettin v. John Harris, Charles Sanders, and Lisa Ellis*, Adv. Case No. 11-03021-RBR (the "Underlying D&O Action") (together, with the Morse Action, the "Underlying Litigation").[1]

Gibraltar obtained executive and organization liability insurance for its directors and officers under policies issued by National Union and Twin City (FAC ¶ 26).  The Insurers each received notice of the Morse Action through a June 29, 2010 letter from Aon, the insurance broker (FAC ¶ 40).[2]

---

[1] Gibraltar and its officers were also sued in Broward County Circuit Court in *Razorback Funding, LLC, et al. v. Scott W. Rothstein, et al.*, Case No. 09-062943(19) (the "Razorback Action") (FAC ¶ 41). In opposing the motions to dismiss, Plaintiffs contend that "having denied coverage for all of the claims asserted by the Banyon Trustee, the Morse Action, and the Razorback plaintiffs, National Union must also demonstrate the *unambiguous* application of the Exclusion to the allegations in each of these matters."  (DE 36 at 18.)   However, Plaintiffs' breach of contract claims allege only that the Insurers breached with respect to the Underlying Litigation (*see* DE 18 at ¶¶ 82, 83, 89, 92); the Court will not consider claims not plead in the complaint.

[2] The Insurers had no obligations to provide coverage for the original complaint in the Morse Action, filed on June 8, 2010, which only asserted claims against Gibraltar.  In the operative complaint in the instant action, Plaintiffs allege that:  "Gibraltar has also been sued in the Circuit Court of the 17th Judicial Circuit in and for Broward County.  In that case, captioned *Edward J. Morse, et al. v. Scott Rothstein et al.*, Case No. 10-24110 (the 'Morse Action'), the amended complaint asserted claims against Gibraltar for aiding and abetting breach of fiduciary duty, aiding and abetting common law fraud, negligence, and negligent supervision.  The amended

Subsequently, in a November 22, 2011 letter, the RRA Trustee provided the Insurers with a draft adversary complaint for the Underlying D&O Action, which asserted claims against Gibraltar executives Harris, Sanders, Ellis, and Hayworth (FAC ¶ 42).  In that letter, and prior to filing suit, the RRA Trustee communicated a $40 million joint settlement demand on behalf of the RRA Trustee and Morse and gave the Insurers thirty days to consent to the settlement by tendering their respective policy limits (FAC ¶ 43).  Attached to the November 22, 2011 letter were several documents, including:  (1) documentation detailing the damages that would be sought at trial; (2) a PowerPoint delineating legal and factual support for the policy limits demand; (3) copies of civil remedy notices of insurer violations against the Insurers submitted to Florida's Department of Financial Services; and (4) a proposed model bar order that would be sought on behalf of Gibraltar and its directors and officers as part of the proposed settlement (FAC ¶ 44).  The $40 million demand consisted of $5 million from Gibraltar, $10 million in remaining limits from an E&O policy tower,[3] and the combined $25 million limits from National Union and Twin City (FAC at 10, n.3).  Seven days later, on

complaint in the Morse Action also asserted claims against Harris, Sanders, Ellis, and Hayworth individually, for negligence.  National Union and Twin City received notice of the Morse Action by way of letter from Aon dated June 29, 2010."  (FAC ¶ 40).  Although Plaintiffs clearly indicated the draft nature of a complaint in other instances, i.e., the D&O Action, (see FAC ¶ 42), the Plaintiffs did not do so when referring to the amended Morse Action.  Thus, it was not until the Court requested the underlying complaints – which constitute the basis of Plaintiffs' claims – that it became apparent that no such amended complaint was ever filed.  While the draft Morse Complaint undoubtedly constitutes a Claim under the Policies, the Court is puzzled by paragraph 40 of the FAC which seems to suggest that the amended Morse complaint was in fact filed.  In addition, Plaintiffs failed to inform the Court that it was not until August 22, 2011, at the earliest, that an amended complaint (in draft format) asserting claims against the directors and officers was provided to the Insurers.  It should be noted that just three months later, the RRA Trustee, Gibraltar, and Morse presented the Insurers with a comprehensive settlement demand for both the underlying D&O Action and the never-filed amended Morse complaint.

[3] The FAC indicates that the $10 million of the E&O tower limits to be contributed toward the global settlement constituted the "remaining" limits.  The pleadings are devoid of any information regarding whether the E&O insurers had been defending the Morse Action, whether the limits of those policies had been eroded, or what the total limits of the E&O policy tower were.

November 29, 2011, the RRA Trustee filed the Underlying D&O Action against Harris, Sanders, and Ellis, seeking damages "far in excess of all applicable insurance." (FAC ¶ 46.)

On December 16, 2011, National Union denied coverage for the Underlying D&O Action (FAC ¶ 49). Gibraltar and the D&O Defendants renewed their request that National Union tender its limits toward the joint settlement, but on December 21, 2011, National Union reiterated its denial (FAC ¶¶ 50-51). On January 18, 2012, National Union again denied coverage and two days later, Twin City also denied coverage (FAC ¶ 52). Following the Insurers' denials, the RRA Trustee, Morse, Gibraltar, and the D&O Defendants "began to conduct arms-length settlement negotiations" and exchanged documents, reports, and evidence in support of their theories of liability, damages, and defenses (FAC ¶ 53).[4] Two weeks later, the parties reached a putative global settlement agreement, concluding that a settlement of $50 million – $10 million more than the original demand – was reasonable with respect to the claims asserted in the Underlying Litigation (FAC ¶ 54).

On February 3, 2012, the RRA Trustee, Morse, and the Banyon Trustee, sent letters to the Insurers providing them with an opportunity to consent to the global settlement – which now included all claims that could be brought by the Banyon Trustee – by tendering their policy limits (FAC ¶ 55). The RRA Trustee explained his disagreement with the Insurers' denials of coverage, an estimation of the exposure faced by the D&O Defendants in the suits brought (or threatened to be brought) against

---

[4] The timeline of events is unclear. Plaintiffs assert that "[in] light of these coverage denials . . . [the RRA Trustee, Morse, Gibraltar, and the D&O Defendants] began to conduct arms-length settlement negotiations." (FAC ¶ 53). However, the parties had undoubtedly engaged in some manner of discussion prior to the denials as evidenced by the previous $40 million joint demand.

4

them, and the agreement of the E&O insurance carriers to contribute $10 million toward the global settlement (FAC ¶ 55). Counsel for the RRA Trustee also provided the Insurers with a draft settlement and assignment agreement that reflected the parties' intention to permit entry of judgment against Gibraltar and the D&O Defendants in the amount of $50 million if the Insurers refused to tender their limits and consent to the global settlement (FAC ¶ 56).

On February 10, 2012, the Insurers rejected the settlement demand outlined in the February 3, 2012 letter (FAC ¶ 59). Six days later, on February 16, 2012, Gibraltar, the D&O Defendants, the RRA Trustee, and the Banyon Trustee entered into a settlement and assignment agreement and filed motions seeking the bankruptcy court's approval of the agreement (FAC ¶ 61). The agreement included a bar order foreclosing the prosecution of any other Rothstein-related claims against Gibraltar or its executives (FAC ¶ 62).[5]

In August, 2012, the Trustees entered into separate written agreements with (1) Gibraltar; (2) the D&O Defendants; (3) Morse; and (4) the Razorback Plaintiffs (FAC ¶ 68). The parties agreed that a reasonable jury could find the D&O Defendants jointly and severally liable in the Underlying D&O Action and that the resulting damages would likely be in excess of $50 million (FAC ¶ 69). Pursuant to the settlement, "Gibraltar

---

[5] Subsequently, the RRA Trustee filed an adversary complaint seeking a temporary restraining order to enjoin prosecution of the Razorback Action pending in Broward County Circuit Court (FAC ¶ 62). The bankruptcy court denied the temporary restraining order. Gibraltar and the D&O Defendants then entered into a settlement agreement with the Razorback plaintiffs for $10 million (FAC ¶¶ 64-65).

agreed to the entry of judgment against it in the Bank Action[6] and the D&O Defendants, jointly and severally, in the D&O Action in the sum of $50 million, and to allow the Trustees to collect on that judgment from the National Union and Twin City." (FAC ¶ 69.)  As part of that agreement (hereinafter, the "Coblentz Agreement"), Gibraltar and the D&O Defendants, pursuant to Florida Statute § 624.155, assigned their rights under the National Union and Twin City policies to the Plaintiffs (FAC ¶ 70).

On August 30, 2012, the Trustees, Morse and the Razorback Plaintiffs, sent the Insurers yet another letter offering to settle their respective claims against Gibraltar and the D&O Defendants if the Insurers would tender their policy limits (FAC ¶ 72).  Included with that letter was: (1) the Trustees' amended motion to approve the settlement with Gibraltar and certain of its officers and directors; (2) the proposed entry of bar orders; (3) the settlement and assignment agreement between Morse and the Trustees; and (4) the settlement agreement between the Trustees and the Razorback Plaintiffs (FAC ¶ 72).  A hearing on the motion to approve the settlement was set for October 2, 2012; accordingly, the Trustees informed the Insurers that they had until October 1, 2012 to consent to the settlement and tender their limits (FAC ¶ 73).  The Trustees warned National Union and Twin City that they intended to pursue all rights and remedies against the Insurers should the Insurers refuse to consent to the settlement (FAC ¶ 73). The Insurers did not agree to tender their policy limits (FAC ¶ 74).

Ultimately, the bankruptcy court approved the settlement and assignment agreements and entered judgment against Gibraltar in the Bank Action and against the

---

[6] The settlement also provided for the entry of judgment against Gibraltar in an adversary action captioned *Herbert Stettin v. Gibraltar Private Bank & Trust. Co.*, Adv. Case No. 10-03767-RBR (the "Bank Action").

D&O Defendants in the Underlying D&O Action in the amount of $50 million (FAC ¶ 75). Following the bankruptcy court's approval, the RRA Trustee dismissed the Underlying D&O Action (FAC ¶ 76).   Plaintiffs then filed the instant action, asserting breach of contract and bad faith claims against National Union and Twin City.[7]

## II.   THE INSURANCE POLICIES

Gibraltar obtained executive and organization liability insurance policies from National Union and Twin City.   The National Union Policy (No. 01-232-51-05) is the primary policy and the Twin City Policy (No. 00 DA 0259335-09) is an excess policy that follows form to the National Union Policy (FAC ¶¶ 26, 37) (collectively, the "Policies"). The Policies were issued to Gibraltar in Florida for the policy period September 17, 2009 to September 17, 2015 (FAC ¶¶ 26-36).[8]   Gibraltar's directors and officers are Insureds under the Policies (FAC ¶ 35, DE 18-1 at 1, 4), which provide coverage for "Claims first made against an Insured during the Policy Period or the Discovery Period . . . and reported to the Insurer" in accordance with the policy terms (DE 18-1 at 7).[9] Specifically, the Policies provide that the Insurer "shall pay the Loss of any Insured Person arising from a Claim made against such Insured Person for any Wrongful Act of such Insured Person, except when and to the extent that an Organization has indemnified such an Insured Person." (DE 18-1 at 7).

---

[7] The parties agreed that the bad faith claims against the Insurers were premature (*see* DE 35 at 18) and the Court abated those claims (DE 70).  Plaintiffs and Defendant Aon also filed a joint motion to abate Plaintiffs' claims against Aon pending "a determination of whether the coverage exists under the National Union and Twin City policies," (DE 47), which the Court granted (DE 55).

[8] The National Union Policy has a $10 million limit of liability and the Twin City Policy has a $15 million limit of liability.

[9] Capitalized terms are defined terms in the Policies.

The Policies define a Claim as:

> (1) A written demand for money, non-monetary, or injunctive relief;
> (2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary, or injunctive relief which is commenced by (i) service of a complaint of similar pleading . . .;
> (3) a civil, criminal, administrative, or regulatory investigation of an Insured Person . . .

(DE 18-1 at 8).

The Policies also contain the following "Professional Services Exclusion":

> The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any Insured alleging, arising out of, based upon, or attributable to the Organization's or any Insured's performance of or failure to perform professional services for others, or any act(s), error(s) or omission(s) relating thereto.

(DE 18-1 at 37).

## III.   LEGAL STANDARD

### A. Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). All factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. *See Speaker v. U.S. Dep't. of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010). Although a plaintiff need not provide "detailed factual allegations," the complaint must provide "more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal citations and quotations omitted). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* Rule 12(b)(6) does not allow dismissal of a complaint because the court

8

anticipates "actual proof of those facts is improbable," but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 545).   This plausibility standard requires that the plaintiff plead enough facts to raise a reasonable expectation that discovery will reveal evidence of the defendant's liability. *Miyahara v. Vitacost.com, Inc.*, 715 F.3d 1257, 1265 (11th Cir. 2013).

In ruling on a motion to dismiss, the Court's consideration is generally confined to the complaint and the attachments. *Zodiac Grp., Inc. v. Axis Surplus Ins. Co.*, 542 F. App'x 844, 849 (11th Cir. 2013).   However, under the incorporation by reference doctrine, the Court may consider extrinsic documents if those documents are central to the  plaintiff's claim and their authenticity is not disputed. *Id.*  Although not attached to Plaintiffs' complaint, the parties agree that the complaints in the Underlying Litigation may be considered in ruling on the motions to dismiss (DE 25 at 5 n.3; DE 36 at 17 n.13).   If the exhibits incorporated by reference contradict the general and conclusory allegations of the pleading, the exhibits govern. *Crenshaw v. Lister*, 556 F.2d 1284 (11th Cir. 2009).

When considering insurance coverage disputes, Courts routinely dismiss complaints for failure to state a claim when a review of the insurance policy and the underlying claim for which coverage is sought unambiguously reveals that the underlying claim is not covered. *See, e.g.*, *Zodiac Grp.*, 542 F. App'x at 845 (affirming dismissal of complaint because the "plain language of the Policy precluded coverage" for the underlying claim); *Band v. Twin City Fire Ins. Co.*, No. 8:11-cv-02332-EAK-TMB, 2012 WL 1142396 at *4 (M.D. Fla. April 4, 2012) (granting motion to dismiss under Rule

12(b)(6) because the underlying claims were "unequivocally excluded" from coverage based on a securities and real estate exclusion); *David Lerner Assocs., Inc. v. Philadelphia Indem. Ins. Co.*, 934 F. Supp. 2d 533, 536 (E.D.N.Y 2013) *aff'd,* 542 F. App'x 89 (2d Cir. 2013) (granting motion to dismiss under Rule 12(b)(6) because the "unambiguous language of the professional services exclusion" applied to bar coverage for the underlying litigation); *Associated Cmty. Bancorp, Inc. v. The Travelers Cos., Inc.*, No. 3:09-CV-1357 JCH, 2010 WL 1416842, at *10 (D. Conn. Apr. 8, 2010) *aff'd*, 421 F. App'x 125 (2d Cir. 2011) (granting 12(b)(6) motion to dismiss because the underlying claims fell "squarely within an unambiguous reading of either the insolvency exclusion . . . or the professional services exclusion"); *MJCM, Inc. v. Hartford Cas. Ins. Co.*, No. 8:09-CV-2275-T-17TBM, 2010 WL 1949585 (M.D. Fla. May 14, 2010) (granting motion to dismiss under Rule 12(b)(6) on breach of contract claim because the underlying lawsuit was not covered under the insurance policy at issue); *Roberts v. Florida Lawyers Mut. Ins. Co.*, 839 So. 2d 843 (Fla. Dist. Ct. App. 2003) (affirming dismissal of breach of contract complaint when policy did not provide coverage for the underlying claim); *Brewer v. U.S. Fire Ins. Co.*, 446 F. App'x 506, 508 (3d Cir. 2011) (affirming dismissal under Rule 12(b)(6) because employee indemnification exclusion precluded coverage for underlying suit); *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 759 F. Supp. 2d 822, 835 (E.D. La. 2010) (granting motions to dismiss because policies' exclusions barred coverage and noting that "courts in this circuit routinely consider policy exclusions in resolving motions to dismiss"); *see also Titan Indem. Co. v. Travelers Prop. Cas. Co. of Am.*, 181 P.3d 303 (Colo. Ct. App. 2007) (granting motion to dismiss and finding that professional services exclusion was unambiguous and barred

coverage for the underlying claim); *Florida Farm Bureau Gen. Ins. Co. v. Ins. Co. of North Am.*, 763 So. 2d 429, 432 (Fla. Dist. Ct. 2000) ("Thus, the applicability of policy exclusions contained in a policy attached as an exhibit may be raised by a motion to dismiss when the allegations of the complaint clearly show that the exclusions do apply.").[10]

### B. Interpretation of Insurance Policies

The interpretation of insurance policies, like the interpretation of all contracts, is generally a question of law. *Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995). When interpreting an insurance policy, Florida courts "start with the plain language of the policy, as bargained for by the parties." *State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004) (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)). The "Florida Supreme Court has made clear that the language of the policy is the most important factor. Under Florida law, insurance contracts are construed according to their plain meaning." *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274-75 (11th Cir. 2008) (internal citations and quotations omitted) (quoting *Taurus Holdings, Inc. v. United States Fid. and Guar. Co.*, 913 So. 2d 528, 537 (Fla. 2005)).

Thus, the Court interprets the policy language according to its "'everyday meaning' as it is 'understandable to the layperson.'" *Ohio Cas. Ins. Co. v. Cont'l Cas. Co.*, 279 F. Supp. 2d 1281, 1283 (S.D. Fla. 2003) (quoting *Hrynkiw v. Allstate Floridian*

---

[10] Even construing the exclusion as an affirmative defense, as the Trustees argue it should be, a "complaint may be dismissed under Rule 12(b)(6) when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint." *Quiller v. Barclays Am./Credit, Inc.* 727 F.2d 1067, 1069 (11th Cir. 1984). In this matter, determining whether the exclusion applies to the underlying claims does not require the Court to make any factual determinations and the complaint and the documents attached and incorporated by reference provide a sufficient basis for the Court to make an appropriate finding.

*Ins. Co.*, 844 So. 2d 739, 741 (Fla. Dist. Ct. App. 2003)).  If "the language used in an insurance policy is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning of the language used so as to give effect to the policy as written."  *Travelers Indem. Co. v. PCR Inc.*, 889 So. 2d 779, 785 (Fla. 2004); *see also Steinberg*, 393 F.3d at 1230 (explaining that the court must read the policy as a whole and give every provision its full meaning and operative effect). This maxim applies to exclusions as well; if an exclusionary provision is unambiguous, the Court must apply the exclusion as it is written.  *See Deni Assocs. of Florida, Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1139 (Fla. 1998) ("[A] court cannot place limitations upon the plain language of a policy exclusion."); *Steinberg*, 393 F.3d at 1230 ("If [the policy] language is unambiguous, it governs.").

In accordance with the "guiding principle" that "insurance contracts must be construed in accordance with the plain language of the policy," only when the relevant policy language is "susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage" will the language be considered ambiguous and, thus, construed in favor of coverage.  *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003); *Anderson*, 756 So. 2d at 34 ("Ambiguous insurance policy exclusions are construed against the drafter and in favor of the insured.").   In order for this principle to apply, there must be a "genuine inconsistency, uncertainty, or ambiguity in meaning"; the principle does "not allow courts to rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties."  *Swire Pac. Holdings*, 845 So. 2d at 165; *see also Jefferson Ins. Co. of New York v. Sea World of Florida, Inc.*, 586 So. 2d 95, 97 (Fla.

Dist. Ct. App. 1991) (Courts are not authorized "to put a strained and unnatural construction on the terms of a policy in order to create an uncertainty or ambiguity").

And even if a provision is complex and requires analysis, this fact does not render the provision ambiguous. *Swire Pac. Holdings*, 845 So. 2d at 165. Likewise, "[t]he lack of a definition of an operative term in a policy does not necessarily render the term ambiguous and in need of interpretation by the courts." *Id.* at 166. "To properly interpret an exclusion in a policy, the exclusion must be read together with the other provisions of the policy and from the perspective of an ordinary person." *Botee v. S. Fid. Ins. Co.*, No. 5D13-3235, 2015 WL 477836, at *2 (Fla. Dist. Ct. App. Feb. 6, 2015). Finally, in interpreting an insurance policy, the Court is mindful that the insured bears the burden of proving that a claim against it is covered by the insurance policy, whereas the insurer bears the burden of proving an exclusion to coverage applies. *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1358 (M.D. Fla. 2001).

### C. The Duty to Defend or Advance Defense Costs

The Policies at issue do not contain a traditional duty to defend; instead, the Policies obligate the Insurers to advance defense costs:

> [T]he Insurer *shall* advance, excess of any applicable retention amount, covered Defenses Costs no later than ninety (90) days after the receipt by the Insurer of such defense bills. . . . The Insurer does not, however, under this policy, assume any duty to defend.

(DE 18-1 at 16) (emphasis added).

Generally, courts have "viewed an insurer's duty to advance defense costs as an obligation congruent to the insurer's duty to defend, concluding that the duty arises if the allegations in the complaint could, if proven, give rise to a duty to indemnify." *Fed. Ins. Co. v. Sammons Fin. Grp., Inc.*, 595 F. Supp. 2d 962, 976-77 (S.D. Iowa 2009); *see,*

13

e.g., *Acacia Research Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* No. 05–501, 2008 WL 4179206, at *11 (C.D. Cal. Feb. 8, 2008) ("[A]s with a duty to defend, Defendant's duty to advance defense costs arose on tender of a potentially covered claim."); *Hurley v. Columbia Cas. Co.,* 976 F. Supp. 268, 275 (D. Del. 1997) ("[T]here does not exist a significant difference between the duty to defend and the promise to advance defense costs, other than the difference between who will direct the defense."); *Am. Chem. Soc. v. Leadscope, Inc.,* No. 04AP–305, 2005 WL 1220746, at *4-8 (Ohio Ct. App. May 24, 2005) (concluding that a "pleadings test" has been consistently applied in cases seeking to establish an insurer's duty to defend and duty to advance defense costs); *Julio & Sons Co. v. Travelers Cas. & Sur. Co. of Am.*, 591 F. Supp. 2d 651, 660 (S.D.N.Y. 2008) ("[T]he Court finds that, for the purposes of this motion, there are no material differences between a duty to defend and a duty to advance Defense Expenses."); *See* Barry R. Ostrager & Thomas R. Newman, *Handbook on Ins. Coverage Disputes,* § 20.06], at 1615-161 (16th ed.) (collecting cases).

As the Honorable Judge William Hoeveler explained, "[a]n insurer's obligation to advance defense expenses is not materially different from a duty to defend." *MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 601 (S.D. Fla. 2013). Under Florida law, an insurer's duty to defend its insured against legal action depends solely on the facts and legal theories alleged in the pleadings and the claims against the insured. *JDC (Am.) Corp.*, 52 F.3d at 1580. Accordingly, the duty to defend is determined by comparing the allegations contained within the four corners of the complaint with the language of policy. *See Jones v. Florida Ins. Guar. Ass'n Inc.*, 908 So. 2d 435, 443 (Fla. 2005); *Philadelphia Indem. Ins. Co. v. Yachtman's Inn Condo*

*Ass'n, Inc.*, 595 F. Supp. 2d 1319, 1322 (S.D. Fla. 2009); *McCreary v. Florida Residential Prop. & Cas. Joint Underwriting Ass'n*, 758 So. 2d 692, 695 (Fla. Dist. Ct. App. 1999) ("[T]he duty of an insurer to defend is determined *solely* by the allegations of the complaint against the insured and an insurer has no duty to defend a suit against an insured if the complaint upon its face alleges a state of facts that fails to bring the case within the coverage of the policy.") (emphasis in original). If the relevant pleadings allege facts that "fairly and potentially bring the suit within policy coverage," then the insurer must defend the action regardless of the merits of the lawsuit. *Jones*, 908 So. 2d at 442-43; *see also JDC (Am.) Corp.*, 52 F.3d at 1580. Any doubts regarding the duty to defend must be resolved in favor of the insured. *Jones*, 908 So. 2d at 443. But if the pleadings show that there is no coverage or that a policy exclusion applies to bar coverage, the insurer has no duty to defend. *Maryland Cas. Co. v. Florida Atl. Orthopedics, P.L.*, 771 F. Supp. 2d 1328, 1332 (S.D. Fla. 2011) *aff'd*, 469 F. App'x 722 (11th Cir. 2012); *Keen v. Florida Sheriffs' Self-Ins.*, 962 So. 2d 1021, 1024 (Fla. Dist. Ct. App. 2007) ("[I]f the pleadings show the applicability of a policy exclusion, the insurer has no duty to defend."); *Reliance Ins. Co. v. Royal Motorcar Corp.,* 534 So. 2d 922, 923 (Fla. Dist. Ct. App. 1988) ("There is no obligation on an insurer to defend an action against its insured when the pleading in question shows the applicability of a policy exclusion.").

## IV.  ANALYSIS

### 1. The Coblentz Agreement

The parties spend considerable portions of their briefs addressing whether the $50 million settlement and *Coblentz* agreement constitutes a "Loss" within the meaning

of the Policies.   However, the ability to recover against an insurer for a *Coblentz* agreement is predicated on the insurer having breached its obligations to its insured under the insurance policy.  *See Chomat v. N. Ins. Co. of New York,* 919 So. 2d 535, 537 (Fla. Dist. Ct. App. 2006) ("Where an injured party wishes to recover under a *Coblentz* agreement, the injured party must bring an action against the insurer and prove coverage, wrongful refusal to defend, and that the settlement was reasonable and made in good faith.") (internal quotations omitted); *Sinni v. Scottsdale Ins. Co.*, 676 F. Supp. 2d 1319, 1324 (M.D. Fla. 2009), *as amended* (Jan. 4, 2010) ("In Florida, a party seeking to recover under a *Coblentz* agreement must prove: (1) coverage; (2) a wrongful refusal to defend; and (3) that the settlement was objectively reasonable and made in good faith."); *Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1322 (11th Cir. 2014) (to recover under a *Coblentz* agreement, the plaintiff must show that the insurer wrongfully refused to defend and that the settlement was reasonable and made in good-faith).

Consequently, "the determination of coverage is a condition precedent to any recovery against an insurer pursuant to a *Coblentz* agreement." *Sinni*, 676 F. Supp. 2d. at 1324.  "Indeed, the mere entry of a consent judgment does not establish coverage and an insurer's unjustifiable failure to defend the underlying action does not estop the insurer from raising coverage issues in a subsequent suit to satisfy a consent judgment entered pursuant to a *Coblentz* agreement." *Id.*  Regardless of whether the *Coblentz* agreement constitutes a Loss under the Policies, the Court must first determine whether the Insurers wrongfully refused to advance defense costs and whether the Policies provided coverage for the Underlying Litigation.  Accordingly, the Court's analysis turns

to whether the Insurers breached their obligations under the Policies in declining coverage for the Underlying Litigation.

### 2. The Professional Services Exclusion

The Policies contain a "Professional Errors & Omissions Exclusion" which provides that the Insurer:

> shall not be liable to make any payment for Loss in connection with any Claim made against any Insured alleging, arising out of, based upon or attributable to the Organization's or any Insured's performance of or failure to perform professional services for others, or any act(s), error(s), or omission(s) relating thereto.

(DE 18-1 at 37).  The parties dispute whether the exclusion applies jointly and whether the exclusion bars coverage for the Underlying Litigation.

### A. The Professional Services Exclusion Applies Jointly to Any Claim Against Any Insured

Before addressing whether the Professional Services Exclusion bars coverage, the Court addresses Plaintiffs' argument that the professional services exclusion is several.  Plaintiffs, in a contorted reading of the plain language of the Policies, argue that the Professional Services Exclusion only bars coverage for a Claim if each and every officer is alleged to have performed professional services, as opposed to the plain reading of the exclusion as barring coverage for a Claim if even one officer is alleged to have performed professional services.[11]  Despite Plaintiffs' efforts to create an

---

[11] Plaintiffs argue that their interpretation is a reasonable one.  The Court disagrees.  In order for a provision to be ambiguous, the language must be susceptible to more than one reasonable interpretation.  "An *unreasonable* reading of an insurance policy provision does not create an ambiguity that must be construed most favorably to the insured." *Roberts v. Florida Lawyers Mut. Ins. Co.*, 839 So. 2d 843, 846 (Fla. Dist. Ct. App. 2003).  The Court may not put a "strained and unnatural construction on the terms of a policy in order to create an uncertainty or ambiguity." *Jefferson Ins. Co. of New York v. Sea World of Florida, Inc.*, 586 So. 2d 95, 97 (Fla. Dist. Ct. App. 1991); *Ground Down*, 540 F.3d at 1274 (quoting *Taurus*, 913 So.2d at 532) (The

ambiguity in the professional services exclusion, the Court finds that no such ambiguity exists; the exclusion is "clear and plain, something only a lawyer's ingenuity could make ambiguous." *Dimmitt Chevrolet, Inc. v. Se. Fid. Ins. Corp.,* 636 So. 2d 700, 704-05 (Fla. 1993) (analyzing a pollution exclusion).

A plain reading of the Professional Services Exclusion demonstrates that it bars coverage for *any* Claim made against *any* Insured arising out of *any* Insured's performance or failure to perform professional services for others. The exclusion is not limited in its application to each insured's performance; instead, it jointly bars coverage for all insureds for *any* Claim arising out of *any* insured's performance or failure to perform professional services. Courts have agreed that "the phrase 'any insured' unambiguously expresses a contractual intent to create joint obligations." *Sales v. State Farm Fire & Cas. Co.*, 849 F.2d 1383, 1385 (11th Cir. 1988); *see, e.g., USAA Cas. Ins. Co. v. Gordon*, 707 So. 2d 1185, 1186 (Fla. Dist. Ct. App. 1998) (when policy did not contain severability clause applicable to coverage part, "[w]e have no trouble concluding that exclusion (h), which excludes coverage for damage caused by '*any* insured,' unambiguously results in joint property coverage in this case.") (emphasis in original); *State Farm Fire & Cas. Ins. Co. v. Kane*, 715 F. Supp. 1558, 1561-62 (S.D. Fla. 1989) (analyzing exclusion that barred coverage for criminal acts done by "any insured" and holding "that the exclusion in the policy before this Court applies to *all* insureds") (emphasis in original); *see also Kattoum v. New Hampshire Indem. Co.*, 968 So. 2d 602, 606 (Fla. Dist. Ct. App. 2007) (Casaneuva, J., Levens, J. concurring) ("If the

---

Court "may not rewrite [the] contract[], add meaning that is not present, or otherwise reach [a] result[] contrary to the intention of the parties," in an effort to find coverage. . ." ). As explained *infra*, Plaintiff's argument would require the Court to do just that.

exclusion was simply 'any insured,' I would read it to exclude coverage for all insureds because it applied to at least one of the insureds.").[12]

The Court's conclusion that the exclusion applies jointly to bar coverage is consistent with a reading of the Policies as a whole.  When the insurance Policies apply severally as to each Insured, the Policies so specify by using the term "such insured." As Plaintiffs correctly note, "[i]n order to trigger coverage, a Claim must be made against a specific Insured Person for that specific Insured Person's Wrongful Act.  The Insuring Agreement is clear that coverage is uniquely dependent on the alleged conduct of each Insured." (DE 36 at 15).  This is because the language of coverage grant is explicitly several:

> The policy shall pay the Loss of any Insured Person arising from a Claim made against *such* Insured Person for any Wrongful Act of *such* Insured Person. . .

(DE 18-1 at 1) (emphasis added).  The Policies consistently indicate when a provision is intended to apply severally or jointly.  For example, certain exclusions are subject to the following severability provision:

> For the purpose of determining the applicability of the foregoing Exclusions 4(a) through 4(c) and Exclusion 4(f): (1) the facts pertaining to and knowledge possessed by any Insured shall not be imputed to any other Insured Person . . .

---

[12] *See also Thoele v. Aetna Cas. & Sur.*, 39 F.3d 724, 727 (7th Cir. 1994) ("The district court was quite right to conclude that the choice of the word 'any' broadened the exclusion to include injuries triggered by one insured in connection with the business pursuit of another."); *Coregis Ins. Co. v. McCollum*, 961 F. Supp. 1572, 1579 (M.D. Fla. 1997) ("Courts have agreed that, unlike the phrase 'the insured,' the use of the phrase 'any insured' in a policy exclusion unambiguously expresses a contractual intent to create joint obligations and to prohibit recovery by an innocent co-insured."); *Axis Reinsurance Co. v. Bennett*, No. 07 CIV. 7924 (GEL), 2008 WL 2485388, at *15 (S.D.N.Y. June 19, 2008) ("[I]t is well established that the language 'any insured' has been consistently interpreted as expressing a contractual intent to create joint obligations").

(DE 18-1 at 8).  Another explicit severability provision appears in Endorsement #14 of the policy which relates to the insurance application (DE 18-1 at 45).  However, no such severability provision exists with respect to the Professional Services Exclusion nor does the Professional Services Exclusion itself contain any language indicating it ought to apply severally.  Therefore, contrary to Plaintiffs' argument, the fact that certain exclusions are expressly subject to a severability clause is not indicia that the other exclusions are also several -- it is additional indicia that they are not.

Moreover, Plaintiffs have failed to provide any precedent from any court to support their contention than an ambiguity exists and that the Professional Services Exclusion applies severally, particularly in the absence of a specific severability provision.[13] *See Swire Pac. Holdings,* 845 So. 2d at 166 (finding exclusion unambiguous and noting that the plaintiff "fail[ed], however, to provide precedent from any court, or even conflicting definitions for the terms, to support its contention that an ambiguity exists").  Based on the plain language of the exclusion, the Court finds that the Professional Services Exclusion applies jointly.  Thus, if the Claim for which the Insureds seek coverage arises from any Insured's performance or failure to perform professional services for others, there is no coverage under the policy for any of the insureds, even if such allegations are only made against a single insured.[14]  Although not addressed by the parties at length, regardless of whether the exclusion applies

---

[13] The case primarily relied upon by Plaintiffs is inapposite. In *Great Am. Ins. Co. v. Geostar Corp.*, No. 09-12488-BC, 2010 WL 845953, at *12-13 (E.D. Mich. Mar. 5, 2010), the underlying Travelers policy contained a "specific severability provision in the exclusions provision."  In the instant case, no such severability provision exists.

[14] As explained *infra,* even if the exclusion applied severally, the exclusion would still bar coverage because the Underlying Litigation contains allegations that each of the Insureds performed, or failed to perform, professional services for others.

jointly or severally as to the directors, the exclusion also bars Claims arising out of the Organization's (Gibraltar's) performance of or failure to perform professional services for others, or any act(s), error(s), or omission(s) relating thereto.  (*See* DE 18-1 at 37).

### B. The Professional Services Exclusions Bars Coverage for the Underlying Litigation

Although the term "professional services" is undefined in the Policies, the Court concludes that the term is unambiguous and that banking services constitute professional services.  Whether an act arises from the performance of a professional service is determined by focusing on the particular act itself, as opposed to the character of the person performing the act.  *Estate of Tinervin v. Nationwide Mut. Ins. Co.*, 23 So. 3d 1232, 1237 (Fla. Dist. Ct. App. 2009).  The "majority of courts to address the issue have concluded that the term 'professional services' unambiguously refers to services unique to a specific profession."  *St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 898-99 (11th Cir. 2009) ("Professional services generally refers to those serves involving specialized knowledge, labor or skill.").  Accordingly, professional services are those services performed by persons who belong to a learned profession or which require specialized skills, training, or experience.  *See, e.g.*, *Auto-Owners Ins. Co. v. E.N.D. Servs., Inc.*, 506 F. App'x 920, 925 (11th Cir. 2013) (despite the fact that the policy did not define professional services, professional services exclusion was unambiguous and barred coverage); *Evanston Ins. Co. v. Budget Grp. Inc.*, 199 F. App'x 867, 868 (11th Cir. 2006) ("The term 'professional' refers to persons who belong to a learned profession or whose occupations require a high level of training and proficiency.").

"When an insurance contract fails to explicitly define the term 'professional services,' Florida Courts have considered, among other things, whether the service involves specialized skill, requires specialized training, is regulated, requires a degree, and/or whether there is an entity that certifies or accredits persons or that sets forth standards of practice for the performance of those services." *Auto-Owners Ins. Co. v. E.N.D. Servs., Inc.*, No. 8:10-CV-2387-T-30EAJ, 2011 WL 6319189, at *4 (M.D. Fla. Dec. 15, 2011) *aff'd*, 506 F. App'x 920 (11th Cir. 2013). Banking is a learned profession which requires specialized skill, training, and knowledge, and which is regulated by the state and federal governments. As such, the Court concludes that banking and banking-related services constitute professional services.[15]

Indeed, the parties do not appear to dispute that banking services are professional services within the meaning of the exclusion; rather, Plaintiffs argue that the Underlying Litigation arises out of "purely internal management and regulatory functions – not services for others." (DE 36 at 17). The question, therefore, is whether

---

[15] *See Bank of California, N. A. v. Opie*, 663 F.2d 977, 982 (9th Cir. 1981) (the activities of a mortgage banker, including the management of loan proceeds and credit, and the ability to secure sufficient financing, were professional services); *Terre Haute First Nat. Bank v. Pac. Employers Ins. Co.*, 634 N.E.2d 1336, 1339 (Ind. Ct. App. 1993) (professional services exclusion barred coverage when complaint alleged that the bank failed to protect the interests of the plaintiff, that bank was negligent, and that the bank had breached its fiduciary duty because the claims arose from allegations that the bank failed to adequately render a professional service to a customer); *State St. Bank & Trust Co. of Quincy, Illinois v. INA Ins. Co. of Illinois*, 207 Ill. App. 3d 961 (1991) (bank's actions relating to a loan constituted professional services); *Neighborhood Hous. Servs. of Am., Inc. v. Turner-Ridley*, 742 F. Supp. 2d 964, 971 (N.D. Ind. 2010) (professional services exclusion barred coverage for insured's actions when insured was alleged to have breached their contractual duty to collect payments, segregate funds, maintain accurate records, and make accurate reports to loan payoffs.); *David Lerner Assocs., Inc.*, 934 F. Supp. 2d at 536 (E.D.N.Y. 2013) *aff'd*, 542 F. App'x 89 (2d Cir. 2013) (individuals involved in the due diligence and sale of financial products are engaged in professional services); *Piper Jaffray Cos., Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 967 F. Supp. 1148 (D. Minn. 1997) (alleged failure to prudently manage investor's assets fell within professional services exclusion); *cf.*, *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 431 (S.D.N.Y. 2007) (describing the provision of banking services that aided in a fraudulent scheme as a professional service).

the Claims – *i.e.*, the complaints – arose out of any insured's performing, or failing to perform, professional services for others.[16]   In determining whether the allegations in the Underlying Litigation potentially trigger the Insurers' obligations under the Policies, the Court is cognizant that "the phrase 'arising out of' is *not* ambiguous and should be interpreted broadly." *Ground Down*, 540 F.3d at 1275 (citing *Taurus Holdings Inc.*, 913 So. 2d at 539).   As the Florida Supreme Court declared, "[t]he term 'arising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.'" *Taurus Holdings*, 913 So. 2d at 539.   "To have arisen out of something, there must be 'some causal connection, or relationship' that is 'more than a mere coincidence' but proximate cause is not required. The phrase 'arising out of' contemplates a more attenuated link than the phrase 'because of.'" *Ground Down*, 540 F.3d at 1275 (internal citations omitted) (quoting *Taurus Holdings*, 913 So. 2d at 539-540).   The Court's analysis is limited to the allegations and theories in the Underlying Lawsuits and the policy language to determine whether the Underlying Lawsuits allege facts that fairly and potentially bring the suit within policy coverage.[17]

The D&O Action asserts four claims against John Harris, Charles Sanders, and Lisa Ellis:   (1) Aiding and Abetting Breach of Fiduciary Duty; (2) Aiding and Abetting

---

[16] Plaintiffs concede that the professional services exclusion "applies to a Claim, which is defined to encompass the entirety of a civil proceeding commenced against the insureds." (DE 35 at 16).

[17] As discussed *supra*, the Court will apply a "duty to defend" standard in determining whether there is a potentiality for coverage under the Policies, notwithstanding the fact that the Policies contain a duty to advance defense costs rather than a traditional duty to defend.  The Court notes that this standard is the most favorable standard of review for the Insured and the standard which the Plaintiffs argue should be applied (*see* DE 74 at 3-4).  Because the duty to defend is broader than the duty to indemnify, a court's determination that the insurer has no duty to defend also requires a finding that there is no duty to indemnify and, therefore, no coverage under the policy. *Yachtman's Inn Condo Ass'n, Inc.*, 595 F. Supp. 2d. at 1322.

Conversion; (3) Negligence; and (4) Gross Negligence.  (DE 25-1.)  The D&O Action alleges, *inter alia*, that[18]:

- Charles Sanders, John Harris and Lisa Ellis "acted within the scope of his [or her] authority as an officer . . . of Gibraltar, and otherwise actively supervised, managed, and/or controlled the various RRA/Rothstein related banking relationships (DE 25-1 at ¶¶ 5-7).

- Rothstein, through key Gibraltar employees including Senior Vice President Harris and Vice President Ellis, leveraged his relationship to cover persistent, sizeable account overdrafts and gained unfettered access to the transfer of money from RRA trust accounts into RRA operating accounts and then out to Rothstein's personal accounts (*Id.* ¶ 29).

- These "special accommodations" provided Rothstein the necessary opportunity to circulate money from the Ponzi using Harris, Ellis, and other Gibraltar employees as team players . . . (*Id.* ¶ 30).

- Gibraltar, with the knowledge and active participation of Harris, Ellis, and Sanders provided the means used by Rothstein and RRA to fill the hole of substantial recurring account balance deficits through regular extensions of credit, by extending significant overdrafts . . . thereby enabling Rothstein to perpetuate the life of his Ponzi scheme (*Id.* ¶ 32).

- Defendants[19], acting at all times within the scope and authority of their duties and responsibilities at Gibraltar, substantially assisted and enabled Rothstein to perpetuate the life of his Ponzi scheme by, among other things:
  - Continuously extending substantial credit to Rothstein and RRA in the form of overdraft protection so that they could cover shortfalls.
  - Modifying or ignoring its own internal policies, procedures, practices and protocols in order to accommodate Rothstein and RRA, who were funneling many millions of dollars through their accounts, Gibraltar covered enormous overdrafts.
  - Advising, assisting, and coaching Rothstein on how to avoid actions that would trigger the filing of internal overdraft reports which in turn would or should have triggered the filing federally-mandated suspicious activity, check-kiting, and related reports.
  - Assisting, enabling, and permitting Rothstein to make substantial recurring transfers between trust, business and personal accounts, and

---

[18] In addition to the paragraphs identified below, the Court relies on the allegations of the Underlying Litigation as a whole, with additional focus on paragraphs 18, 31, 34, 37, 41, 45, 57, 58, 60, 68, 76, 80, 81, 86 and 92 of the D&O Action.

[19] The term Defendants refers to Sanders, Harris, Ellis and Gibraltar.

> for personal expenses without regard to the source of the funds or to
> their stated purpose and to misappropriate trust account balances. . .
> o Improperly overriding internal risk, compliance, and fraud prevention
> concerns for the purpose of preserving the banking relationship with
> Rothstein (*Id.* ¶ 36).

(DE 25-1).[20]

Likewise, the draft amended Morse complaint alleges, *inter alia*:

- Gibraltar employees assisted Rothstein in avoiding detection by assisting him in concealing repeated and substantial overdrafts, and concealing inappropriate usage of funds held in trust. . . As an example, John Harris . . . emailed Rothstein in 2007 imploring him to reduce his overdraft in one account because it was "starting to show up on the wrong reports."  On numerous occasions, Gibraltar employees prompted Rothstein of overdraft issues and advised him on how he could move money around from client trust accounts to other accounts to avoid detection. (DE 73-1 ¶ 15).[21]

- Ellis, instead of taking steps to investigate or stop the overdrafts, was a key figure in assisting Rothstein's concealment of same.  Lisa Ellis frequently emailed Rothstein, Debra Villegas and Irene Shannon to propose shuffling money from one RRA account to another to cover overdrafts and avoid scrutiny. . . . Ellis failed to inquire into Rothstein's activities, failed to prevent unlawful diversions; and failed to impose restrictions on Rothstein's banking activities.  (*Id.* ¶¶ 162-165).

- Hayworth disregarded obvious warning signs, red flags, and overt warnings from some subordinates, and directed his subordinates to cultivate, and not damage the relationship with Rothstein. (*Id.* ¶ 180).

Looking solely at the allegations in the operative complaints and the plain

language of the Policies, the Court finds that the Professional Services Exclusion bars

---

[20] The draft D&O Action contains substantially similar allegations, with additional allegations against Hayworth.  For example, the draft D&O Action alleges that "Steven D. Hayworth acted within the scope of his authority as an officer . . . of Gibraltar, and otherwise actively supervised, managed, and/or controlled the various RRA/Rothstein related banking relationships" (DE 71-2 ¶ 7).  It also alleged that Gibraltar, with the knowledge and active participation of Hayworth, Harris, Ellis and Sanders, provided the means used by Rothstein and RRA to fill the hole of substantial recurring account balance deficits through regular extensions of credit, by extending significant overdrafts . . . thereby enabling Rothstein to perpetuate the life of his Ponzi scheme (DE 71-2 ¶ 33).

[21] Harris, Ellis, Sanders, and Hayworth are each alleged to have "knowledge of all the facts and circumstances" in paragraph 15 (DE 73-1 ¶¶ 153, 161, 169, 177).

coverage for the Underlying Litigation because the conduct alleged in the complaints, including each count asserted against the officers, arise out of, or are attributable to, the Insureds' performance, or failure to perform, professional services for others. The complaints in the Underlying Litigation are replete with factual allegations regarding the professional services, namely banking services, performed by Harris, Ellis, Sanders, Hayworth, and Gibraltar for the benefit of Rothstein and the RRA accounts.

Plaintiffs' contention that the Underlying Litigation arises out of "purely internal management and regulatory functions – not services for others," (DE 36 at 17) is belied by a common sense reading of all of the allegations in the Underlying Litigation. As outlined above, the Underlying Litigation and the conduct described therein indisputably arises out of the directors' and Gibraltar's performance of professional services for Rothstein. A review of the Underlying Litigation shows that any failure by Gibraltar or its officers to comply with internal management procedures or to perform certain regulatory functions was done in order to preserve the Rothstein accounts and to facilitate Rothstein's business, and therefore those failures constitute professional services for others.[22] *See MDL Capital Mgmt., Inc. v. Federal Ins. Co.*, 274 F. App'x 169, 173 (3d Cir. 2008) (finding that plaintiffs' argument that directors were not alleged to have performed professional services because the complaint alleged "inaction, lack of diligence and oversight, and failure to intervene . . . [which] caused the overleveraging of the Fund's assets" was meritless because the claims stemmed from the director's

---

[22] (*See, e.g.*, DE 25-1 at ¶ 36 ["Modifying or ignoring its own internal policies, procedures, practices and protocols *in order to accommodate Rothstein and RRA*, who were funneling many millions of dollars through their accounts, Gibraltar covered enormous overdrafts. . . Improperly overriding internal risk, compliance, and fraud prevention concerns *for the purpose of preserving the banking relationship with Rothstein*."] (emphasis added)).

failures as investment managers and therefore arose from the providing of, or failure to provide, professional services); *David Lerner Assocs.,* 934 F. Supp. 2d at 536 (E.D.N.Y. 2013) *aff'd,* 542 F. App'x 89 (2d Cir. 2013) (the failure to engage in due diligence in connection with the sale of financial products were quintessential actions and inactions falling within the definition of professional services such that exclusion barring coverage for performance or failure to perform professional services for others applied); *Colony Ins. Co. v. Suncoast Med. Clinic, LLC*, 726 F. Supp. 2d 1369, 1377 (M.D. Fla. 2010) (implementing policies and procedures are an intricate part of professional services which can trigger a professional services exclusion); *Piper Jaffray Co., Inc.*, 967 F. Supp. at 1156 (applying professional services exclusion to bar coverage and rejecting plaintiffs' contention "unsupported by a shred of relevant case law" that failure to follow accounting procedures and engaging in inadequate or false reporting were not professional services).

Even if allegations existed relating solely to "purely internal management and regulatory functions," the Policies would still bar coverage because, as alleged in the Underlying Litigation, any such functions constitute "act(s), error(s), or omission(s) *relating*" to professional services performed by the D&O Defendants or Gibraltar for Rothstein and the RRA Accounts.  A review of the Underlying Litigation makes clear that the actions identified by Plaintiff as "allegations in the FAC failure to perform purely internal management and regulatory functions" (DE 36 at 17-18) were undertaken in order to "substantially assist[] and enable[] Rothstein to perpetuate the life of his Ponzi scheme." (*See* DE 25-1 ¶ 36).  Thus, considering the plain language of the policies and the allegations in the Underlying Litigation, the Underlying Litigation is unequivocally

excluded from coverage because the Claims arose out of "the Organization's or any Insured's performance of or failure to perform professional services for others, or any act(s), error(s), or omission(s) relating thereto."  (DE 18-1 at 37).

### C. The Insurance Policies are Not Illusory

In the alternative, Plaintiffs argue that if the Professional Services Exclusion bars coverage for the Underlying Litigation, the Policies are illusory because the Policies then "treat[] Gibraltar's entire business as a service and any flawed business conduct covered by the D&O coverage as within the E&O exclusion."  (DE 36 at 18).[23]  Under Florida law, when policy provisions, limitations, or exclusions completely contradict the insuring provisions, the insurance coverage is illusory.  *Colony Ins. Co. v. Total Contracting & Roofing, Inc.*, No. 10-23091-CIV, 2011 WL 4962351, at *5 (S.D. Fla. Oct. 18, 2011).  No such contradiction exists here.

The Policies provide coverage for many Claims that would not involve professional services for others.  For example, the Policies provide coverage for wrongful termination claims, harassment claims, retaliation claims, and negligent hiring, training, retention, and supervision claims (*see* DE 18-1 at 3).  Likewise, the policies provide coverage for securities claims made against any insured (*see* DE 18-1 at 5).  Courts considering substantially similar policies and businesses have agreed that such policies are not illusory.  *See Turner-Ridley,* 742 F. Supp. 2d at 973 (rejecting argument that "because [the insured's] core business practices constitute professional services" the policy was illusory and finding that the policy "covers many reasonably expected

---

[23] Although not relevant to nor considered in the Court's coverage determination, the Court notes that a complementary tower of coverage existed for professional errors and omissions which contributed $10 million to the settlement of the Underlying Litigation.

circumstances that would not involve professional services"); *Associated Cmty. Bancorp, Inc.*, 2010 WL 1416842, at *10 (rejecting plaintiffs' argument that the professional services exclusion eviscerated the policy because every action taken by a bank involves professional services).

## V.    CONCLUSION

For the foregoing reasons, the Court finds that the professional services exclusion unambiguously bars coverage for the Underlying Litigation.  Consequently, the Insurers' motions to dismiss (DE 25, 28) are **GRANTED** and the claims against the Insurers are **DISMISSED WITH PREJUDICE.**

**DONE AND ORDERED** in chambers in Miami, Florida, this 14 day of May, 2015.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE