UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 13-21653-Civ-WILLIAMS/TORRES

MICHAEL I. GOLDBERG not individually but
as Liquidating Trustee of the Rothstein Rosenfeldt
Adler, P.A. Liquidating Trust,

ROBERT C. FURR, not individually but as
Chapter 7 Trustee of the estate of Banyon 1030-32,
LLC, and as Chapter 7 Trustee of the estate of
Banyon Income Fund, LP,

      Plaintiffs,

v.

AON RISK SERVICES, NORTHEAST, INC.,

      Defendant.
_____/

## ORDER ON PLAINTIFFS' *DAUBERT* MOTION

This matter is before the Court on Michael I. Goldberg's and Robert C. Furr's (collectively, "Plaintiffs") *Daubert* motion to exclude the testimony of Aon Risk Services Northeast, Inc.'s ("Defendant") witnesses – Scott Stein ("Mr. Stein") and Frederick Fisher ("Mr. Fisher"). [D.E. 186]. Defendant responded on August 15, 2018 [D.E. 193] to which Plaintiffs replied on August 22, 2018. [D.E. 208]. Therefore, Plaintiffs' motion is now ripe for disposition. After careful review of the motion, response, reply, relevant authority, and for the reasons discussed below, Plaintiffs' *Daubert* motion is **DENIED**.[1]

---

[1] On August 2, 2018, the Honorable Kathleen Williams referred Plaintiffs' *Daubert* motion to the undersigned Magistrate Judge for disposition. [D.E. 190].

1

## I. BACKGROUND

The facts of this case relate to a $1.2 billion Ponzi scheme and two underlying lawsuits: (1) *Edward J. Morse, et al. v. Scott W. Rothstein, et al.*, Case No. 10-24110; and (2) *Herbert Stettin v. John Harris, et al.*, Adv. Case No. 11-03021-RBR (collectively, the "Underlying Litigation").[2] In 2005, Gibraltar Private Bank & Trust ("Gibraltar") was a private bank, conducting business in South Florida. Between 2005 and 2009, Gibraltar was a wholly owned subsidiary of Boston Private, a publicly traded company. In September 2009, the former owners of Gibraltar purchased the bank from Boston Private. In connection with that purchase, Defendant was tasked with providing Gibraltar with a runoff insurance policy[3] that would protect Gibraltar's directors and officers ("D&Os") against claims alleging wrongful acts during the five year period it was owned by Boston Private. The insurance policies that are the subject of this case were brokered by Defendant and issued to Gibraltar on the day of the closing of the spinoff sale transaction.

The purchase and sale agreement between Boston Private and Gibraltar required the acquisition of a six year runoff policy to cover future claims against the Gibraltar D&Os for wrongful acts that may have occurred while Gibraltar was operating as a subsidiary of Boston Private. The terms of the agreement required

---

[2] Investors in the Underlying Litigation sued Plaintiffs because the latter enabled an individual, by the name of Scott Rothstein, to perpetuate a Ponzi scheme. Specifically, the investors alleged that some of the Plaintiffs disregarded internal concerns from Gibraltar's compliance personnel and ignored federally mandated checks, balances, protocols, and regulations that would have resulted in the cessation of Scott Rothstein's misconduct.

[3] A runoff policy is a policy that extends the reporting period for claims that accrued before a change in ownership and control.

Defendant to procure a policy with terms "not less than the existing coverage under, and has other terms not materially less favorable on the whole to the insured persons than, the director's & officer's liability insurance coverage presently maintained by the Bank prior to closing." [D.E. 196].

Plaintiffs allege that, instead of going out into the marketplace and obtaining the appropriate insurance coverage for executives of a small private bank, Defendant relied on the same D&O policy that had been issued to Boston Private during the prior year.[4] Plaintiffs claim that the policy contained an exceedingly broad Professional Services Exclusion that eliminated coverage for anything except securities and sexual harassment claims. The policy that Defendant procured was from National Union Fire Insurance Company ("National Union") and provided $10 million in coverage. Defendant also obtained a policy from Twin City Fire Insurance Company ("Twin City") (collectively, the "D&O Carriers") promising an additional $15 million in excess coverage.

Plaintiffs allege that Defendant did nothing to negotiate the removal or amendment of the Professional Services Exclusion and instead brokered a policy that left Gibraltar's D&Os without adequate insurance. The policies, for example, did not cover any failures to comply with banking regulations, federal laws, or regulations enacted to prevent financial crimes. Gibraltar purportedly understood none of this at the time it purchased the policies because it relied on Defendant's expertise as its long-time broker to provide it with the appropriate coverage. In

---

[4] Boston Private's Banker's Professional Liability ("BPL") policies tendered full policy limits of $15 million for the allegations presented in the Underlying Litigation.

3

sum, Plaintiffs allege that Defendant failed to advise Gibraltar of the (1) implications of the Professional Services Exclusion, (2) the scope of coverage under the insurance policy, or (3) other policies that were available on the market.

As part of this lawsuit, Plaintiffs also sued National Union and Twin City for an additional $25 million in coverage for the Underlying Litigation. The D&O Carriers moved to dismiss Plaintiffs' complaint based upon language of the Professional Services Exclusion. The Court agreed and entered judgment in their favor. Plaintiffs appealed that decision and the Eleventh Circuit affirmed. [D.E. 80]. On September 25, 2017, Plaintiffs filed a second amended complaint ("SAC") against Defendant for (1) negligence (in failing to procure adequate insurance coverage), and (2) breach of fiduciary duty. Plaintiffs allege that Defendant failed to obtain proper coverage for Gibraltar and that Defendant failed to meet the required standard of care.

## II. APPLICABLE PRINCIPLES AND LAW

The decision to admit or exclude expert testimony is within the trial court's discretion and the court enjoys "considerable leeway" when determining the admissibility of this testimony. *See Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005). As explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the admissibility of expert testimony is governed by Fed. R. Evid. 702. The party offering the expert testimony carries the burden of laying the proper foundation for its admission, and admissibility must be shown by a preponderance of the evidence. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300,

1306 (11th Cir. 1999); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case.").

"Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589).[5] The purpose of this role is "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Also, in its role as "gatekeeper," its duty is not "to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)

To facilitate this process, district courts engage in a three part inquiry to determine the admissibility of expert testimony:

---

[5] Rule 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

5

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa*, 158 F.3d 548, 562 (11th Cir. 1998) (citations omitted). The Eleventh Circuit refers to the aforementioned requirements as the "qualification," "reliability," and "helpfulness" prongs and while they "remain distinct concepts"; "the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech*, 326 F.3d at 1341).

In determining the reliability of a scientific expert opinion, the Eleventh Circuit also considers the following factors to the extent possible:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis.

*Quiet Tech*, 326 F.3d at 1341 (citations omitted). The aforementioned factors are not "a definitive checklist or test," *Daubert*, 509 U.S. at 593, but are "applied in case-specific evidentiary circumstances," *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). While this inquiry is flexible, the Court must focus "solely on principles and methodology, not on conclusions that they generate." *Daubert*, 509 U.S. at 594-95. It is also important to note that a "district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the

6

jury.'" *Quiet Tech*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking but admissible evidence." *Daubert*, 509 U.S. at 580; *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) ("As gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'") (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

"[T]he objective of [the gatekeeping role] is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert,* 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991).

## III.  ANALYSIS

Plaintiffs' *Daubert* motion seeks to exclude Defendant's experts – Mr. Stein and Mr. Fisher – because they are unqualified to render any opinions in this case. Beginning with Mr. Stein, Plaintiffs concede that he has generic knowledge of the insurance industry, but that experience is unrelated to the facts of this case. Plaintiffs allege, for example, that Mr. Stein has never served as a broker in the financial institutions arena and has never worked as an underwriter for an insurance company.  Instead, Plaintiffs claim that Mr. Stein only has *de minimis* experience in the placement of D&O policies for public and private banks and that his opinions are entirely unsupported on whether a carrier would have obtained a policy with a Professional Services Exclusion or sought a less restrictive version. Because Mr. Stein is unqualified and his opinions are unreliable, Plaintiffs conclude that his testimony must be excluded.

As for Mr. Fisher, Plaintiffs argue that he cannot serve as an expert in this case because he has never been deposed or testified at a trial in a case involving a Professional Services Exclusion in a D&O policy.  While Mr. Fisher's expert report states that his experience is in the specialty lines insurance industry, Plaintiffs contend that Mr. Fisher's broker experience is limited to a ten year period from 1994-2004.  During his deposition, Plaintiff claims that Mr. Fisher could not remember if he procured any D&O policies for a public or private bank during the relevant timeframe of 2008 to 2010.  And similar to Mr. Stein, Mr. Fisher has never worked for any insurance company in an underwriting or managerial capacity.

Because Defendant has offered two experts with insufficient experience, Plaintiffs conclude that both of their opinions must be excluded.

### A. *Qualifications*

Mr. Stein's expert opinions relate to whether Gibraltar had errors and omissions coverage under a separate BPL policy and whether Defendant breached its duty of care. Despite having been deposed over fifty times as an expert, Plaintiffs argue that Mr. Stein has never given testimony in a case that involves a Professional Services Exclusion in a D&O policy. Plaintiffs allege that Defendant has only been retained *once* as an expert in connection with a D&O policy. And while Mr. Stein has worked as an insurance arena from 1993 to 1998 at a large brokerage firm, Plaintiffs contend that his experience was exclusively in manufacturing, technology, and professional liability for small, non-national accounts.

Plaintiffs also claim that Mr. Stein has only procured a D&O policy on two prior occasions – both of which were prior to 2010. Plaintiffs believe that Mr. Stein has merely worked as a general broker and expert, and that he has never been employed as an underwriter for an insurance company. Plaintiffs also argue that Mr. Stein has no experience with D&O policies for either public or private banks. Because Mr. Stein is neither qualified nor competent to testify about whether it was routine practice for an insurance company to issue a D&O policy to a small private bank, Plaintiffs conclude that his testimony will not assist the trier of act and should be excluded.

In a similar vein, Plaintiffs seek to exclude Mr. Fisher's opinions because he is unqualified. Mr. Fisher advances three opinions in his expert report: (1) that it would have been impossible to obtain a D&O policy for Gibraltar without a Professional Services Exclusion like the one found in the National Union Policy, (2) that a D&O policy is not the appropriate policy to cover the causes of action in the Underlying Litigation, and (3) that insurers try to avoid providing double coverage to their clients. Despite these opinions, Plaintiffs argue that Mr. Fisher could not provide one instance where he procured a D&O policy for a bank during the relevant time period:

> Q: Okay, and how many bank D&O policies did you place in 2009?
> A: Gosh, I have no idea.
> Q: Y ou're going to know a lot better than the jury is and I am. So let's - - break it down. On a monthly basis in 2009 how many banks are we talking about that you were placing D&O coverage for?
> A: Well, like I said, I don't know. There were - - the book of business I had was – was varied, I certainly had a number of financial institutions, not just banks but certainly financial organizations that fell into that category, and certainly several were banks. And we saw them routinely. We didn't always get them
> . . .
> Q: So going back to my question, in 2009 how many director and officer liability policies did you place for banks
> A: I don't know.
> . . .
> Q: Sitting here today, Mr. Fisher, you cannot think of a single public or private bank for which you placed director and officer liability coverage in 2009, correct?
> A: That is correct.

(Fisher Dep. Tr. 87:10-25; 90:16-19; 91:21-25).

Plaintiffs also point out that, while Mr. Fisher spent twenty-five years of his professional life working on the claims side of the insurance industry, he has never

10

worked for an insurance company in an underwriting or managerial capacity. Plaintiffs claim that Mr. Fisher has also never given deposition testimony or testified at a trial in a case involving a Professional Services Exclusion in a D&O policy. As such, Plaintiffs seek to exclude Mr. Fisher's opinions because he lacks any specialized knowledge to qualify him as an expert.

An expert may be qualified to testify in multiple ways: "'by knowledge, skill, experience, training, or education'" and "not necessarily unqualified simply because her experience does not precisely match the matter at hand." *Furmanite Am., Inc.*, 506 F. Supp. 2d at 1129 (citing *Maiz,* 253 F.3d at 665, 669). "Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.'" *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (quoting *Jack v. Glaxo Wellcome, Inc.,* 239 F.Supp.2d 1308, 1314–16 (N.D. Ga. 2002)). "In other words, a district court must consider whether an expert is qualified to testify competently regarding the matters he intends to address." *Clena Investments, Inc.*, 280 F.R.D. at 661 (citing *City of Tuscaloosa,* 158 F.3d at 562–63).

Determining an expert's qualifications is not a stringent inquiry "and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (citations omitted); *see also Johnson v. Big Lots Stores, Inc.,* 2008 WL 1930681, *14 (E.D .La.

Apr. 29, 2008) (summarizing *Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 507 n. 10 (5th Cir. 1999), as "explaining that after an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination"); *see also Martinez v. Altec Indus., Inc.,* 2005 WL 1862677, *3 (M.D. Fla. Aug. 3, 2005) (quoting *Rushing,* 185 F.3d at 507 ("As long as some reasonable indication of qualifications is adduced . . . qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity")). After a review of the relevant issues and an expert's qualifications, "the determination regarding qualification to testify rests within the district court's discretion." *Clena Investments, Inc.*, 280 F.R.D. at 661 (citing *Berdeaux v. Gamble Alden Life Ins. Co.,* 528 F.2d 987, 990 (5th Cir. 1976) (footnote omitted)).

After a thorough review of the arguments presented, Plaintiffs' motion to exclude Mr. Stein and Mr. Fisher on the basis that they are unqualified lacks merit. Plaintiffs argue that Defendant's experts are unqualified because they have never been deposed or testified in a case in relation to a Professional Services Exclusion and a D&O insurance policy. But, the number of times an expert is deposed or testifies at trial are not the measuring sticks by which an expert's qualifications, reliability, and helpfulness are determined. In any event, both Mr. Stein and Mr. Fisher have significant experience in the insurance industry and both relied on extensive documents, articles, and publications in forming their opinions.

Plaintiffs seek to exclude Mr. Stein because he has no experience with D&O policies for either public or private banks. Plaintiffs claim, for instance, that Mr. Stein's experience is limited to the placement of two D&O policies prior to 2000. Plaintiffs' argument is unpersuasive because Mr. Stein has a significant history of quoting banks in the insurance procurement process. Mr. Stein has worked for over-twenty-five years in the insurance industry as an agent and a broker with a specialization in professional liability insurance, including brokering D&O liability policies for public banks. For example, between 2008 and 2010, Mr. Stein placed professional liability policies and D&O policies for private and publicly traded companies. And while Plaintiffs suggest that Mr. Stein appeared confused at his deposition with respect to the language in insurance policies, Plaintiffs' argument is not entirely accurate.[6] Because the evidence presented shows that Mr. Stein has a significant level of experience in the insurance industry and D&O policies, we conclude that he is qualified to render his opinions on an insurance broker's standard of care and whether Defendant met that standard.

Plaintiffs' motion to exclude Mr. Fisher on the basis that he is unqualified is equally unpersuasive. The record shows that Mr. Fisher has forty-three years of specialized insurance experience as a broker, underwriter, claims adjuster, compliance specialist, claims auditor, and consultant. He also has substantial experience in specialty lines insurance that includes D&O and professional liability

---

[6] Mr. Stein explained in his rebuttal report that "external exclusions in the form of endorsements are more often written with verbiage to explicitly state the absolute exclusion in detailed language; internal exclusions, by contrast, are often confusing." [D.E. 193].

13

insurance. Mr. Fisher has been deposed between 50 and 100 times, twice in connection with negligent procurement and once in connection with a D&O policy. And although Mr. Fisher has not worked as an underwriter for an insurance company, he was a managing underwriter with authority to quote and bind policies from 1999 to 2004. Mr. Fisher has also reviewed many documents to form his opinions, including numerous treatises and articles about exclusions in D&O policies. Therefore, Mr. Fisher is qualified to be an expert in this case because the record demonstrates that he is knowledgeable of the insurance industry, and, in particular, D&O policies.

### B. *Reliability*

Next, Plaintiffs argue that the opinions of Mr. Stein and Mr. Fisher should be excluded because they are unreliable. With respect to Mr. Stein, Plaintiff claims that he testified that a runoff policy should always mirror an expiring policy, but that there is no rule in the insurance industry that requires this approach. Because Mr. Stein's testimony is inconsistent and not grounded in anything other than his subjective beliefs, Plaintiffs conclude that his opinions are unreliable and must be excluded.

As for Mr. Fisher, Plaintiffs argue that his opinions are unreliable because he could not identify a single bank – public or private – where he procured a D&O policy during the relevant time frame:

> Q: Okay. So the answer to my questions is in 2009 it may have been that you placed zero D&O policies for either a public or private bank?
> A: Theoretically that's possible. I don't think it is.
> Q: Do you know sitting here today that you placed even one D&O policy for either a public or private bank in 2009?
> A: God, I can't remember when – that name we acquired. I don't know.
> Q: So, sitting here today it's fair to say that you cannot think of a single one, correct?
> A: No, not now. Not eight – seven years later, or eight years later, nine years later, no.
> Q: And I apologize, it was the fault of my question. Let me try again. Sitting here today, Mr. Fisher, you cannot think of a single public or private bank for which you placed a director and officer liability coverage in 2009; correct?
> A: That is correct. I can't remember.

[D.E. 208].

Plaintiffs also take issue with Mr. Fisher's opinion – that no insurance provider would have issued a liability policy without a Professional Services Exclusion – because Plaintiffs' "expert . . . confirms Mr. Fisher is demonstrably wrong." [D.E. 208]. As such, Plaintiffs conclude that Mr. Fisher's opinions are fatally flawed and cannot be presented to a jury.

"The reliability standard is established by Rule 702's requirement that an expert's testimony pertain to 'scientific . . . knowledge,' since the adjective 'scientific' implies a grounding in science's methods and procedures, while the word 'knowledge' connotes a body of known facts or of ideas inferred from such facts or accepted as true on good grounds." *Daubert*, 509 U.S. at 580. This entails an assessment of whether the "methodology underlying the testimony is scientifically valid." *Id*. at 592. The four non-exhaustive factors used to evaluate the reliability of a scientific expert opinion include the following:

15

(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Frazier*, 387 F.3d at 1262 (citations omitted).

Beginning with Plaintiffs' motion to exclude Mr. Stein, Plaintiffs' arguments are unavailing. Plaintiffs suggest that a minor inconsistency is enough to find that an expert fails the reliability prong under *Daubert*. But, Plaintiffs failed to cite any authority – and we can find none – that supports that contention. Plaintiffs' arguments are, at best, aimed at the weight that should be given to Mr. Stein's opinions – not their admissibility. *See, e.g.*, *Pods Enterprises, Inc. v. U-Haul Int'l, Inc.*, 2014 WL 2625297, at *3 (M.D. Fla. June 12, 2014) ("PEI also argues that Dr. Wood improperly weighted the data, included improper questions, and failed to employ proper quality controls. These criticisms likewise go to the weight of her opinions, not their admissibility.").

In any event, Plaintiffs' arguments are also unpersuasive because there does not appear to be any inconsistency in Mr. Stein's opinions. Mr. Stein testified that there was no rule that required a broker to procure the exact same insurance coverage if broader coverage was available. At the same time, Mr. Stein also testified that he had never seen any tail coverage that was broader than an expiring policy. This explains why Mr. Stein stated that a runoff policy should always mirror an expiring policy even if there is no rule in the insurance industry that mandates this approach. To the extent Plaintiffs seek to highlight any weaknesses

16

in Mr. Stein's opinions at trial, Plaintiffs are entitled to do so for the purposes of impeachment because "[v]igorous cross-examination will allow [Plaintiffs] to address the deficiencies of [Mr. Stein's] report, a process that should not be supplanted by *Daubert*'s gatekeeper role." *Id*. But, Plaintiffs may not exclude Mr. Stein's expert reports and testimony when the potential weaknesses identified are aimed at the weight of his opinions. Therefore, Plaintiffs' motion to exclude Mr. Stein's opinions as unreliable is **DENIED**.

Plaintiffs' motion to exclude Mr. Fisher is also unconvincing. Plaintiffs claim that their own expert is correct on whether an insurance provider would include a Professional Services Exclusion in a D&O policy and that Mr. Fisher – who has a different opinion – should be excluded for being incorrect. The relief Plaintiffs seek is unavailable under *Daubert* because it is not the role of the Court to referee a match between dueling experts. Our review, instead, is to ensure that experts are qualified, reliable, and able to assist the trier of fact. And while Plaintiffs suggest that Mr. Fisher never procured any D&O policies during the relevant time period, that contention is contradicted by the underlying record. Mr. Fisher testified that he could not quantify the amount of policies he procured during the relevant time period because of his recollection of events that occurred almost a decade ago. He never testified that he had no experience with D&O policies. Because all of the evidence presented shows that Mr. Fisher is reliable and that his opinions are based on data and facts, Plaintiffs' motion to exclude his opinions as unreliable is **DENIED**.

C. *Helpfulness*

Plaintiffs' final argument is that the opinions of Mr. Stein and Mr. Fisher will not assist or help the trier of fact because they are cumulative on (1) D&O insurance policies, (2) Gibraltar's insurance program, and (3) the state of the insurance market in 2009. Plaintiffs claim that both experts have similar backgrounds and that they worked as brokers in the insurance industry. Because the opinions of both experts may create the risk that a jury will resolve differences in expert opinion by "counting heads" instead of giving fair consideration to the quality and credibility of each expert's opinions, Plaintiffs conclude that only one of Defendant's experts is necessary for trial.

"[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person" and offers something "more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63 (citations omitted). While "[a]n expert may testify as to his opinions on an ultimate issue of fact . . . he 'may not testify as to his opinion regarding ultimate legal conclusions.'" *Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1122 (S.D. Fla. 2014) (quoting *Delatorre,* 308 F. App'x at 383). The Eleventh Circuit has also made clear that "merely telling the jury what result to reach is unhelpful and inappropriate." *Umana-Fowler*, 49 F. Supp. 3d at 1122 (citing *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)). Federal Rule of Evidence 403 also allows the Court to "exclude relevant evidence if its probative

value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence." Fed. R. Evid. 403

Plaintiffs' arguments are unpersuasive because Mr. Stein's and Mr. Fisher's opinions are complementary – not cumulative. Mr. Stein's opinions concern the general standard of care applicable to insurance brokers and whether Defendant's conduct in procuring the runoff D&O policy met that standard of care. By contrast, Mr. Fisher's opinions relate to (1) whether a policy without a Professional Services Exclusion was available on the market during the relevant time period, (2) whether Gibraltar could have found a runoff D&O policy with a narrower Professional Services Exclusion, (3) whether the underlying claims gave rise to insurance coverage under the policy, and (4) whether an insurer could extend coverage under two different policies. These areas of testimony are complimentary because they build on each other to address the elements of Plaintiffs' claims against Defendant. To the extent that their testimony overlaps at trial, Plaintiffs may raise those concerns with the District Judge. Accordingly, Plaintiffs' motion to exclude the testimony of Mr. Stein and Mr. Fisher is **DENIED**.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs' *Daubert* motion to exclude the testimony of Mr. Stein and Mr. Fisher is **DENIED**.  [D.E. 186].

**DONE AND ORDERED** in Chambers at Miami, Florida, this 12th day of September, 2018.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge