# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 13-21653-Civ-WILLIAMS/TORRES

MICHAEL I. GOLDBERG not individually but
as Liquidating Trustee of the Rothstein Rosenfeldt
Adler, P.A. Liquidating Trust,

ROBERT C. FURR, not individually but as
Chapter 7 Trustee of the estate of Banyon 1030-32,
LLC, and as Chapter 7 Trustee of the estate of
Banyon Income Fund, LP,

      Plaintiffs,

v.

AON RISK SERVICES, NORTHEAST, INC.,

      Defendant.
_____/

## ORDER ON DEFENDANT'S *DAUBERT* MOTION

This matter is before the Court on Aon Risk Services Northeast, Inc.'s ("Defendant") *Daubert* motion to exclude the testimony of Michael I. Goldberg's and Robert C. Furr's (collectively, "Plaintiffs") expert, Larry Goanos ("Mr. Goanos"). [D.E. 183]. Plaintiffs responded on August 15, 2018 [D.E. 194] to which Defendant replied on August 22, 2018. [D.E. 205]. Therefore, Defendant's motion is now ripe for disposition. After careful review of the motion, response, reply, relevant authority, and for the reasons discussed below, Defendant's *Daubert* motion is **DENIED**.[1]

---

[1] On August 2, 2018, the Honorable Kathleen Williams referred Defendant's *Daubert* motion to the undersigned Magistrate Judge for disposition. [D.E. 190].

## I. BACKGROUND

The facts of this case relate to a $1.2 billion Ponzi scheme and two underlying lawsuits: (1) *Edward J. Morse, et al. v. Scott W. Rothstein, et al.*, Case No. 10-24110; and (2) *Herbert Stettin v. John Harris, et al.*, Adv. Case No. 11-03021-RBR (collectively, the "Underlying Litigation").[2] In 2005, Gibraltar Private Bank & Trust ("Gibraltar") was a private bank, conducting business in South Florida. Between 2005 and 2009, Gibraltar was a wholly owned subsidiary of Boston Private, a publicly traded company. In September 2009, the former owners of Gibraltar purchased the bank from Boston Private. In connection with that purchase, Defendant was tasked with providing Gibraltar with a runoff insurance policy[3] that would protect Gibraltar's directors and officers ("D&Os") against claims alleging wrongful acts during the five year period it was owned by Boston Private. The insurance policies that are the subject of this case were brokered by Defendant and issued to Gibraltar on the day of the closing of the spinoff sale transaction.

The purchase and sale agreement between Boston Private and Gibraltar required the acquisition of a six year runoff policy to cover future claims against the Gibraltar D&Os for wrongful acts that may have occurred while Gibraltar was operating as a subsidiary of Boston Private. The terms of the agreement required

---

[2] Investors in the Underlying Litigation sued Plaintiffs because the latter enabled an individual, by the name of Scott Rothstein, to perpetuate a Ponzi scheme. Specifically, the investors alleged that some of the Plaintiffs disregarded internal concerns from Gibraltar's compliance personnel and ignored federally mandated checks, balances, protocols, and regulations that would have resulted in the cessation of Scott Rothstein's misconduct.

[3] A runoff policy is a policy that extends the reporting period for claims that accrued before a change in ownership and control.

Defendant to procure a policy with terms "not less than the existing coverage under, and has other terms not materially less favorable on the whole to the insured persons than, the director's & officer's liability insurance coverage presently maintained by the Bank prior to closing." [D.E. 196].

Plaintiffs allege that, instead of going out into the marketplace and obtaining the appropriate insurance coverage for executives of a small private bank, Defendant relied on the same D&O policy that had been issued to Boston Private during the prior year.[4] Plaintiffs claim that the policy contained an exceedingly broad Professional Services Exclusion that eliminated coverage for anything except securities and sexual harassment claims. The policy that Defendant procured was from National Union Fire Insurance Company ("National Union") and provided $10 million in coverage. Defendant also obtained a policy from Twin City Fire Insurance Company ("Twin City") (collectively, the "D&O Carriers") promising an additional $15 million in excess coverage.

Plaintiffs allege that Defendant did nothing to negotiate the removal or amendment of the Professional Services Exclusion and instead brokered a policy that left Gibraltar's D&Os without adequate insurance. The policies, for example, did not cover any failures to comply with banking regulations, federal laws, or regulations enacted to prevent financial crimes. Gibraltar purportedly understood none of this at the time it purchased the policies because it relied on Defendant's expertise as its long-time broker to provide it with the appropriate coverage. In

---

[4] Boston Private's Banker's Professional Liability ("BPL") policies tendered full policy limits of $15 million for the allegations presented in the Underlying Litigation.

3

sum, Plaintiffs allege that Defendant failed to advise Gibraltar of the (1) implications of the Professional Services Exclusion, (2) the scope of coverage under the insurance policy, or (3) other policies that were available on the market.

As part of this lawsuit, Plaintiffs also sued National Union and Twin City for an additional $25 million in coverage for the Underlying Litigation. The D&O Carriers moved to dismiss Plaintiffs' complaint based upon language of the Professional Services Exclusion. The Court agreed and entered judgment in their favor. Plaintiffs appealed that decision and the Eleventh Circuit affirmed. [D.E. 80]. On September 25, 2017, Plaintiffs filed a second amended complaint ("SAC") against Defendant for (1) negligence (in failing to procure adequate insurance coverage), and (2) breach of fiduciary duty. Plaintiffs allege that Defendant failed to obtain proper coverage for Gibraltar and that Defendant failed to meet the required standard of care.

## II. APPLICABLE PRINCIPLES AND LAW

The decision to admit or exclude expert testimony is within the trial court's discretion and the court enjoys "considerable leeway" when determining the admissibility of this testimony. *See Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005). As explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the admissibility of expert testimony is governed by Fed. R. Evid. 702. The party offering the expert testimony carries the burden of laying the proper foundation for its admission, and admissibility must be shown by a preponderance of the evidence. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300,

4

1306 (11th Cir. 1999); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case.").

"Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589).[5] The purpose of this role is "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Also, in its role as "gatekeeper," its duty is not "to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)

To facilitate this process, district courts engage in a three part inquiry to determine the admissibility of expert testimony:

---

[5] Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

5

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa*, 158 F.3d 548, 562 (11th Cir. 1998) (citations omitted). The Eleventh Circuit refers to the aforementioned requirements as the "qualification," "reliability," and "helpfulness" prongs and while they "remain distinct concepts"; "the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech*, 326 F.3d at 1341).

In determining the reliability of a scientific expert opinion, the Eleventh Circuit also considers the following factors to the extent possible:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis.

*Quiet Tech*, 326 F.3d at 1341 (citations omitted). The aforementioned factors are not "a definitive checklist or test," *Daubert*, 509 U.S. at 593, but are "applied in case-specific evidentiary circumstances," *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). While this inquiry is flexible, the Court must focus "solely on principles and methodology, not on conclusions that they generate." *Daubert*, 509 U.S. at 594-95. It is also important to note that a "district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the

6

jury.'" *Quiet Tech*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking but admissible evidence." *Daubert*, 509 U.S. at 580; *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) ("As gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'") (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

"[T]he objective of [the gatekeeping role] is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert,* 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)).

## III. ANALYSIS

Defendant's *Daubert* motion seeks to exclude Plaintiff's expert, Mr. Goanos, because he is unreliable to render any opinions in this case. Defendant argues that Mr. Goanos's report, rebuttal report, and testimony fail to support his opinions with any data, facts, industry standards, or any other concrete evidence. Defendant also claims that Mr. Goanos failed to consider all of the evidence presented and that his opinions are fatally flawed. For example, Defendant alleges that Mr. Goanos reviewed policy forms without the underlying endorsements and that he did not consider any underwriting guidelines in connection with his reports. Making matters worse, Defendant suggests that Mr. Goanos was unemployed[6] during the relevant time period and that he was not knowledgeable of market conditions at the time. In sum, Defendant concludes that Mr. Goanos's opinions are inadmissible because (1) they will not assist the trier of fact, and (2) they are unreliable. Accordingly, Defendant seeks to exclude the testimony of Mr. Goanos as an expert witness because he fails to satisfy at least two of the requirements under *Daubert*.

### A. *Qualifications*

Mr. Goanos offers four significant opinions in his expert reports: (1) that "insurance was readily available in 2009 that would have provided coverage to the Directors and Officers of Gibraltar," (2) that "Aon did not meet customary insurance industry minimum standards of care," (3) that insurers do not universally refuse to cover a single claim under two or more insurance policies, and (4) that "Aon should

---

[6] Plaintiffs argue that Defendant is being disingenuous with statements that Mr. Goanos was unemployed in 2009. Mr. Goanos apparently took time off in 2009 to get married and relocate his residence before forming his own consulting firm.

8

have requested that [the insurer] provide a broad 'failure to supervise' carve-back to the . . . Professional Services Exclusion." [D.E. 183-1].

An expert may be qualified to testify in multiple ways: "'by knowledge, skill, experience, training, or education'" and "not necessarily unqualified simply because her experience does not precisely match the matter at hand." *Furmanite Am., Inc.*, 506 F. Supp. 2d at 1129 (citing *Maiz,* 253 F.3d at 665, 669). "Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.'" *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (quoting *Jack v. Glaxo Wellcome, Inc.,* 239 F.Supp.2d 1308, 1314–16 (N.D. Ga. 2002)). "In other words, a district court must consider whether an expert is qualified to testify competently regarding the matters he intends to address." *Clena Investments, Inc.*, 280 F.R.D. at 661 (citing *City of Tuscaloosa,* 158 F.3d at 562–63).

Determining an expert's qualifications is not a stringent inquiry "and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (citations omitted); *see also Johnson v. Big Lots Stores, Inc.,* 2008 WL 1930681, *14 (E.D .La. Apr. 29, 2008) (summarizing *Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 507 n. 10 (5th Cir. 1999), as "explaining that after an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of

vigorous cross-examination"); *see also Martinez v. Altec Indus., Inc.,* 2005 WL 1862677, *3 (M.D. Fla. Aug. 3, 2005) (quoting *Rushing,* 185 F.3d at 507 ("As long as some reasonable indication of qualifications is adduced . . . qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity")). After a review of the relevant issues and an expert's qualifications, "the determination regarding qualification to testify rests within the district court's discretion." *Clena Investments, Inc.*, 280 F.R.D. at 661 (citing *Berdeaux v. Gamble Alden Life Ins. Co.,* 528 F.2d 987, 990 (5th Cir. 1976) (footnote omitted)).

Defendant does not challenge the qualifications of Mr. Goanos as it concedes he has relevant experience in the insurance industry. [D.E. 205] ("Aon . . . does not contest that Goanos has general and non-contemporary experience in the insurance industry."]. However, Defendant argues that Mr. Goanos's experience, *standing alone*, is insufficient to meet the requirements under *Daubert*. Defendant relies, for example, on Rule 702 of the Federal Rules of Evidence which permits a "witness who is qualified as an expert by . . . experience . . . [to] testify in the form of an opinion if, and only if, that expert also basis his or her testimony on 'sufficient facts or data' and is the product of reliable principles and methods," among other factors. Fed. R. Evid. 702. In other words, Defendant's argument is that just because "an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *Frazier*, 387 F.3d at 1261.

We agree with both parties that Mr. Goanos has the necessary experience to be an expert in this case. Mr. Goanos's career began in 1994 at National Union[7] where he was the chief underwriting officer of the financial institutions group. In that position, he was responsible for drafting policies, endorsements, providing approval for endorsements, and drafting underwriting guidelines. After leaving National Union, Mr. Goanos worked for ACE USA as a Senior Vice President where he oversaw all D&O insurance for financial institutions and commercial lines of business, as well as insurance for financial institutions. He then returned to National in 1998 as a Senior Vice President and was promoted to Executive Vice President of the financial institutions division. Mr. Goanos eventually formed his own consulting firm, Andros Risk Services, where he continues to work in the insurance field and conducts audits of underwriting portfolios, drafts policies for insurance carriers, provides risk management services for brokers and other professionals. After forming his own firm, Mr. Goanos became the Dean of the CLM Claims College, which is an educational organization dedicated to teaching insurance professionals in every aspect of an insurance claim. Accordingly, Mr. Goanos has decades of experience in the insurance industry and has personal experience as an (1) underwriter, (2) underwriting manager, (2) broker, (4) Chief Underwriting Officer, and (5) Executive Vice President.

As for Defendant's argument that Mr. Goanos cannot serve as an expert if he relies solely on his experience, that contention is founded on well settled principles.

---

[7] Prior to working at National Union, Mr. Goanos was a practicing attorney in New York City with a focus on insurance coverage and other litigation matters.

*See, e.g., Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) ("[W]hile an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability."). But, to make that finding we must consider whether Mr. Goanos relied on any other facts or data to support his opinions. This requires an analysis of the remaining *Daubert* factors to determine whether Mr. Goanos's reports and testimony are reliable and helpful to qualify him as an expert in this case. Therefore, we turn to the second *Daubert* factor.

### B. *Reliability*

Defendant argues that Mr. Goanos's opinions and testimony are unreliable for several reasons. First, Defendant claims that Mr. Goanos failed to support his opinions with any data or facts, and instead relied solely on his experience in the insurance industry with repeated assertions that he is "certain" his opinions are valid. (Tr. 37:18– 25; 38:1–13) ("I don't recall a specific account, but I am certain it occurred fairly regularly."); (Tr. 79:8–25; 80:1–14) ("I absolutely know I did that but I cannot tell you specific account names but I am sure it has happened."). Because every opinion that Mr. Goanos proffers is grounded solely in his experience and unsupported with any additional facts or data, Defendant concludes that he fails to meet the requirements under Federal Rule of Evidence 702.

Second, Defendant takes issue with Mr. Goanos's contention that there were three alternative D&O insurance policies on the market in 2009 and that Defendant failed to advise Plaintiffs of their availability. Defendant argues that Mr. Goanos's

opinions are completely unreliable because he reviewed incomplete policy forms in reaching his conclusions:

> A. I looked at generic policy forms available at that time, but I didn't have access to the files of specific insureds. I just—going off my knowledge of the industry in 2009, I formulated my opinion [on] what I saw as generic forms that are available in the market.
> Q. So you can't point me to any specific policy that was issued to a specific insured that would contain or not contain the professional services exclusion?
> A. My belief is that many existed but, again, I don't have specific access to individual insured files, so I cannot point you to one, but it's my strong opinion that many, many existed.
> Q. In formulating your opinion you didn't go out into the marketplace and find specific examples; that correct?
> . . . .
> THE WITNESS: Correct.

(Tr. 143:2–21). In other words, Defendant suggests that Mr. Goanos reviewed policy forms without their underlying endorsements – a critical error in evaluating whether the Professional Services Exclusion was available in alternative policies. Defendant concludes that Mr. Goanos's expert reports and testimony are therefore unreliable because this entire case relates to the Professional Services Exclusion that appears in the endorsements to Gibraltar's runoff D&O policies.[8]

Third, Defendant claims that Mr. Goanos failed to review any underwriting guidelines in connection with his report. Defendant believes that Mr. Goanos has no idea whether the three alternative insurance policies would have written a runoff D&O policy without the Professional Services Exclusion and that Mr. Goanos made no effort to contact the underwriters of those three companies to inquire as to

---

[8] If Mr. Goanos is allowed to testify at trial, Defendant fears that his testimony will mislead the jury into believing that there were other policies on the market that would have provided better coverage than Defendant was able to obtain in the procurement process.

13

the relevant underwriting guidelines. In realizing his mistake, Defendant claims that Mr. Goanos asserted that his "experience" provides a sufficient foundation:

> Q. Okay. So other than this, you know, general opinion you have that Aon could have gotten that coverage, what factual basis do you have for saying that?
> . . .
> THE WITNESS: Again, I am here to express my opinion on the totality of my experience. I don't have a specific account. I am certain they exist, but I can't point you to one, but my strong opinion is that they exist.

(Tr. 150:24-151:8). Because Mr. Goanos failed to review any underwriting guidelines, Plaintiff concludes that his expert reports are entirely unreliable.

"The reliability standard is established by Rule 702's requirement that an expert's testimony pertain to 'scientific . . . knowledge,' since the adjective 'scientific' implies a grounding in science's methods and procedures, while the word 'knowledge' connotes a body of known facts or of ideas inferred from such facts or accepted as true on good grounds." *Daubert*, 509 U.S. at 580. This entails an assessment of whether the "methodology underlying the testimony is scientifically valid." *Id.* at 592. The four non-exhaustive factors used to evaluate the reliability of a scientific expert opinion include the following:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Frazier*, 387 F.3d at 1262 (citations omitted).

After an independent review of the underlying expert reports and the testimony in the record, we recognize that the assumptions on which Mr. Goanos's

opinions are based may be subject to criticism. However, it is not for the Court, on a *Daubert* motion, to determine the credibility and persuasiveness of Mr. Goanos's opinions. All of the defects Defendant identified merely affect the weight of Mr. Goanos's opinions, as opposed to their admissibility. *See, e.g.*, *Pods Enterprises, Inc. v. U-Haul Int'l, Inc.*, 2014 WL 2625297, at *3 (M.D. Fla. June 12, 2014) ("PEI also argues that Dr. Wood improperly weighted the data, included improper questions, and failed to employ proper quality controls. These criticisms likewise go to the weight of her opinions, not their admissibility.").

For example, Defendant alleges that Mr. Goanos failed to review any underwriting guidelines and incomplete policy forms. While that may be a potential defect in Mr. Goanos's opinions, it does not undermine the entire analysis that there may have been alternative insurance policies on the market in 2009. In other words, whether complete versus incomplete policy forms (or underwriting guidelines) provide a better indicator of whether policies contain a Professional Services Exclusion is a debatable question and is "'close enough' that [Mr. Goanos's] results and opinions may be considered reliable." *Id.* To the extent that Defendant is concerned about Mr. Goanos's testimony at trial, "[v]igorous cross-examination will allow [Defendant] to address the deficiencies of [Mr. Goanos's] report, a process that should not be supplanted by *Daubert'*s gatekeeper role." *Id.*

As for Defendant's contention that Mr. Goanos relied solely on his experience in forming his opinions, that argument lacks merit because Mr. Goanos examined three alternative policies that were available on the market in 2009. He then

15

juxtaposed those policies with the purchase and sale agreement between Boston Private and Gibraltar. He also reviewed other documents produced in discovery to determine whether Defendant scheduled any internal policy review meetings or critiqued Gibraltar's expiring D&O insurance coverage. This is only some of the items that Mr. Goanos reviewed in the record. While Mr. Goanos may not have relied on an abundance of documents, it is clear that he did not rely *solely* on his experience in forming his opinions. To the extent Defendant wants to highlight any weaknesses in Mr. Goanos's opinions at trial, Defendant is entitled to do so for the purposes of impeachment. But, Defendant may not exclude Mr. Goanos's expert reports and testimony when all of the defects identified are aimed at the weight of his opinions. Because the relief Defendant seeks is not permitted on a *Daubert* motion, the motion to exclude Mr. Goanos's reports and testimony is **DENIED**.

### C. *Helpfulness*

Defendant's final argument is that Mr. Goanos's opinions will not assist or help the trier of fact for three independent reasons. First, Defendant contends that Mr. Goanos is unhelpful because he lacks the specific knowledge required to understand the key issues in this case and failed to review the policies, endorsements, and supporting facts. Instead of aiding the trier of fact, Defendant claims that Mr. Goanos's opinions will confuse the jury because "no thought [was] given to any possible endorsements or to the applicable underwriting guidelines." [D.E. 183]. Second, Defendant argues that Mr. Goanos's opinions are unhelpful because he failed to review the insurance coverage of the policies that covered a

16

portion of Plaintiffs' liability in the Underlying Litigation. Third, Defendant alleges that Mr. Goanos is unhelpful because Mr. Goanos was unemployed during the relevant time period between August and September 2009. And when Defendant questioned Mr. Goanos on whether he searched the marketplace to see if any insurers issued runoff policies without a Professional Services Exclusion during that time frame, Mr. Goanos claimed that he based his opinions on his knowledge of the insurance market. Because Mr. Goanos was unemployed and failed to review all of the policies, endorsements, and supporting facts, Defendant concludes that Mr. Goanos will be unhelpful to the trier of fact.

"[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person" and offers something "more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63 (citations omitted). While "[a]n expert may testify as to his opinions on an ultimate issue of fact . . . he 'may not testify as to his opinion regarding ultimate legal conclusions.'" *Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1122 (S.D. Fla. 2014) (quoting *Delatorre,* 308 F. App'x at 383). The Eleventh Circuit has also made clear that "merely telling the jury what result to reach is unhelpful and inappropriate." *Umana-Fowler*, 49 F. Supp. 3d at 1122 (citing *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)).

Here, Defendant's arguments are unpersuasive because Defendant has merely referenced potential defects in Mr. Goanos's expert reports and testimony. For example, Defendant argues that a lack of attention to possible endorsements or

17

underwriting guidelines is fatal to Mr. Goanos as an expert. While Defendant may disagree with the methodology that Mr. Goanos used and the documents he examined, that is not enough to exclude his opinions. Defendant appears to believe that potential weaknesses in Mr. Goanos's testimony and experts reports are grounds for the exclusion of his opinions. But, Defendant's arguments merely attack the weight that should be given to those opinions at trial – not their admissibility. As stated earlier, Defendant is entitled to undermine those opinions for the purposes of impeachment at trial but may not exclude them on a *Daubert* motion merely because they may suffer from potential defects.

Defendant also claims that Mr. Goanos is unhelpful because he failed to personally search the marketplace for alternative policies and that he was unemployed during the relevant time period. Mr. Goanos admits that he was unemployed in August and September 2009, but he explained that only he took time off work for personal matters and that he remained knowledgeable of the market and the available insurance policies. While Defendant may be skeptical of Mr. Goanos's contention, we cannot weigh his credibility on a *Daubert* motion. That determination is for the jury to decide. As such, Defendant's motion to exclude Mr. Goanos's expert reports and testimony is **DENIED** because there is ample evidence in the record that his opinions may assist the trier of fact in the disposition of this case.

## IV. CONCLUSION

For the foregoing reasons, Defendant's *Daubert* motion to exclude the testimony of Mr. Goanos is **DENIED**. [D.E. 183].

**DONE AND ORDERED** in Chambers at Miami, Florida, this 12th day of September, 2018.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge